AARON J. PRISBREY, P.C.
Aaron J. Prisbrey, #6968
Elizabeth B. Grimshaw, #8854
Attorneys for Plaintiffs
1090 East Tabernacle Street
St. George, Utah 84770
Telephone (435) 673-1661
taysha@prisbreylaw.com
elizgrimshaw@gmail.com

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| GARRY PENNINGTON, as co-personal representative of the estate and an individual heir of the deceased WADE PENNINGTON, JUDY PENNINGTON, as co-personal representative of the estate and an individual heir of the deceased WADE PENNINGTON, and TYLER PENNINGTON, as legal heir of WADE PENNINGTON, <br><br>                    Plaintiffs/Petitioners, <br><br>   v. <br><br>SALT LAKE COUNTY, SALT LAKE COUNTY DISTRICT ATTORNEY'S OFFICE, LOHRA L. MILLER, MICHAEL LEARY, SOUTH JORDAN CITY, SOUTH JORDAN POLICE DEPARTMENT, LINDSEY D. SHEPHERD, JARED NICHOLS, BRETT PEREZ, WEST JORDAN CITY, WEST JORDAN POLICE DEPARTMENT, KEN MCGUIRE, TRAVIS REES, and JOHN DOES, I – X, <br>                 Defendant/Respondent. | **AMENDED COMPLAINT (JURY DEMANDED)** <br><br><br>Case No.:  2:10-cv-497 <br>Judge: Dee Benson |

1

COMES NOW, the Plaintiffs, Garry Pennington and Judy Pennington, by and through

the undersigned counsel and for their complaint in this matter against the Defendants and DOES

I-X, inclusive allege and state as follows:

**INTRODUCTION**

1.  The preceding paragraphs are incorporated herein by reference.

2.  This is a civil rights action seeking compensatory and punitive damages from the

Defendants for violating numerous rights under the Constitution of the United States and Utah

State Law in connection with the fatal police shooting of Plaintiffs' son, WADE

PENNINGTON, on March 28, 2009, in West Jordan, Salt Lake County, Utah.

**PARTIES**

3.  The preceding paragraphs are incorporated herein by reference.

4.  At all times relevant, decedent, WADE PENNINGTON, was a resident of Duchesne

County, Utah, who would frequently stay with friends and family in South Jordan and West

Jordan, Utah.

5.  Plaintiff, GARRY PENNINGTON, sues both in his individual capacity as the father of

the decedent and in a representative capacity as the duly appointed general co-personal

representative of the estate of Wade Pennington, pursuant to the Order of the Honorable A.L.

Payne, Eighth District Court, State of Utah.

6.  Plaintiff, JUDY PENNINGTON, sues both in her individual capacity as the mother of the

decedent and in a representative capacity as the duly appointed general co-personal

2

representative of the estate of Wade Pennington, pursuant to the Order of the Honorable A.L. Payne, Eighth District Court, State of Utah.

7. Plaintiff, TYLER PENNINGTON, sues in his capacity as legal heir as the son of decedent.

8. At all times relevant, Defendant SALT LAKE COUNTY, was and is a duly organized public entity existing under the Utah Constitution and the laws of the State of Utah. It is responsible for the policies, procedures, and practices implemented through its various agencies, agents, departments, and employees, and for injury occasioned thereby. It was and is the public employer of Defendants Lohra L. Miller and Michael S. Leary.

9. At all times relevant, the SALT LAKE DISTRICT ATTORNEY'S OFFICE was and is a political subdivision of Salt Lake County, organized under the laws of the State of Utah and Salt Lake County as the chief law enforcement office for the Defendant Salt Lake County, responsible for all criminal investigations and prosecutions in Salt Lake County and is also responsible for the policies, procedures, and practices implemented through its various agencies, agents, departments, and employees, and for injury occasioned thereby. It was and is the public employer of Defendants Lohra L. Miller and Michael S. Leary.

10. At all times relevant, Defendant LOHRA L. MILLER was acting under the color of state law and was the duly elected District Attorney for the Salt Lake District Attorney's office. She was and is the chief law enforcement officer for the Defendant Salt Lake County, responsible for all criminal investigations and prosecutions in Salt Lake County and also responsible for the policies, procedures, and practices implemented through the Salt Lake District Attorney's

3

various agencies, agents, departments, and employees, and for injury occasioned thereby. Defendant Lohra L. Miller is sued in her individual and official capacity with respect to her investigative responsibilities and is therefore subject to qualified immunity.

11. At all times relevant herein, Defendant MICHAEL S. LEARY was a duly appointed police sergeant with the Salt Lake County District Attorney's office, who at all times relevant to this Complaint was acting in his individual and official capacity within the course and scope of his employment and acting under color of State and County law.

12. At all times relevant, Defendant SOUTH JORDAN CITY was and is a municipal corporation organized under the laws of the State of Utah, which owns, operates, manages, directs and controls the South Jordan Police Department and is responsible for injury occasioned thereby. It is also the public employer of Defendants Lindsey Shepherd, Jared Nichols and Brett Perez.

13. At all times relevant, SOUTH JORDAN POLICE DEPARTMENT was and is the public law enforcement agency for South Jordan City, Utah. It is responsible for the policies, procedures, and practices implemented through its various agencies, agents, departments, and employees, and for injury occasioned thereby. It is also the public employer of Defendants Lindsey D. Shepherd, Jared Nichols, and Brett Perez.

14. At all times relevant, Defendant LINDSEY D. SHEPHERD was the duly appointed Chief of Police of the South Jordan Police Department, who was acting in his individual and official capacity in the course and scope of his employment under the color of State and Municipal law.

4

15. At all times relevant, Defendant JARED NICHOLS was a duly appointed police officer with the South Jordan Police Department, who was acting in his individual and official capacity in the course and scope of his employment under the color of State and Municipal law

16. At all times relevant, Defendant BRETT PEREZ was a duly appointed police officer with the South Jordan Police Department, who was acting in his individual and official capacity in the course and scope of his employment under the color of State and Municipal law.

17. At all times relevant, WEST JORDAN CITY was and is a municipal corporation organized under the laws of the State of Utah, which owns, operates, manages, directs and controls the West Jordan Police Department and is responsible for injury occasioned thereby. It is also the public employer of Defendants Ken McGuire and Travis Rees.

18. At all times relevant, WEST JORDAN POLICE DEPARTMENT was and is the public law enforcement agency for West Jordan City, Utah. It is responsible for the policies, procedures, and practices implemented through its various agencies, agents, departments, and employees, and for injury occasioned thereby. It is also the public employer of Defendants Ken McGuire and Travis Rees.

19. At all times relevant, Defendant KEN MCGUIRE was the duly appointed Chief of Police of the West Jordan Police Department, who was acting in his individual and official capacity in the course and scope of his employment and acting under the color of State and municipal law.

20. At all times relevant, Defendant TRAVIS REES was a duly appointed police sergeant with the South Jordan Police Department, who at all times relevant to this Complaint was acting

5

in his individual and official capacity in the course and scope of his employment and acting

under the color of State and municipal law.

21. The true defendants DOES I-X, inclusive, are unknown to Plaintiffs, who therefore sue

these defendants by such fictitious names. Plaintiffs will seek leave to amend this complaint to

show the true names and capacities of these defendants when they have been ascertained. Each

of the fictitious named defendants is responsible in some manner for the conduct and liabilities

alleged herein.

22. Plaintiff sues all public employees in their official and individual capacities.

23. At all times relative to this Complaint, the actions of the defendants toward Pennington

were under color of the statutes, ordinances, customs, and usage of Salt Lake County, Salt Lake

County District Attorney's Office, South Jordan City, South Jordan Police Department, West

Jordan City, and the West Jordan Police Department, respectively.

## JURISDICTION AND VENUE

24. The preceding paragraphs are incorporated herein by reference.

25. This civil action arises under the United States Constitution and Federal law for  redress

of injuries pursuant to 42 U.S.C. §1983, 1985, 1986, 1988; and 18 U.S.C. §§ 1961-1968 and

pursuant to the fourth, fifth, eighth and fourteenth amendments of the United States Constitution.

Additionally, this Court has pendent jurisdiction to entertain claims arising under Utah State Law

pursuant to 28 U.S.C.  § 1367.

26. Jurisdiction is appropriate in this Court pursuant to 28 U.S.C. §§ 1331, 1344 and 1367.

27. Further, on or about May 27, 2010, Plaintiffs timely filed a "Notice of Claim" pertaining to each and every named defendant pursuant to the provisions of Utah Code Ann. §63G-7-401 *et seq*. and the information provided by the respective governmental entities in the Governmental Immunity Act Database and 60 days have elapsed without response from any governmental entity.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

28. The preceding paragraphs are incorporated herein by reference.

29. Pennington, at the time of his death, was 41 years of age and had spent the majority of his adult life residing in Salt Lake County and Duchesne County, Utah.

30. Pennington owned and operated a business called "Wade's Handyman" doing handyman work in Salt Lake, Duchesne and Summit counties.

31. Prior to his death, Pennington was well known to both West Jordan and South Jordan law enforcement agencies. Pennington had been arrested and convicted on numerous misdemeanor and felony charges stemming from investigations by both the South Jordan and West Jordan Police Departments.

32. The decade prior to Pennington's death, South Jordan and West Jordan law enforcement became very hostile toward Pennington because of what those two police departments saw as a "soft" judicial system that did not punish Pennington commensurate with what they believed the commission of his various crimes deserved:

7

a.      In 2001, Pennington was sentenced to Commitment to the Utah State
Prison resulting from a probation violation stemming from felonies committed
and investigated by law enforcement in West Jordan.  This Commitment was
ordered by Third District Court Judge Leslie A. Lewis.  (See Pennington v. State
of Utah, 120P.3d 42 (Ut. Ct. Apps. 2005).)

b.      After being incarcerated for a period of months, Pennington filed a
Petition for Writ of Habeas Corpus challenging the facts and circumstances under
which he was committed to the Utah State Prison.

c.      On July 29, 2005, the Utah Court of Appeals granted Pennington's Pro-Se
Petition remanding his case to the Third District Court for a determination as to
whether Pennington was sentenced lawfully. Id. at 44-5.

d.      Upon remand to the District Court, it was found that Pennington had been
committed unlawfully, and he was ordered released from prison.  Pennington was
released from prison in December of 2005.

e.      Upon information and belief, shortly after Pennington's release from
prison, law enforcement in West Jordan and South Jordan stepped up their efforts
to catch Pennington in criminal activity, as there was a belief that his early release
by the Court of Appeals was not justified.

f.      Over the next 14 months Sergeant Allen Crist of the South Jordan Police
Department and Detective Thoman of the Sandy City police department worked
in tandem in an attempt to catch Pennington engaged in criminal activity.

g.      In February of 2007, Sergeant Crist in conjunction with at least 13 officers
with the South Jordan Police Department and Thoman in conjunction with at least
23 officers of the Sandy City Police Department caused to be filed two separate
felony Informations against Pennington in the Third District State Court, West
Jordan Department of Salt Lake County.

h.      The two Informations contained 17 felony counts and 12 misdemeanor
counts against Pennington.  The Informations were filed by newly elected District
Attorney Lohra L. Miller and/or her deputy attorney.

8

i.      The cases were consolidated and Pennington pled guilty to a vast majority, if not all, of the numerous charges in front of Third District Court Judge, the Honorable Robert W. Adkins.

j.      Over the objections of law enforcement and the prosecutor, Judge Adkins held Pennington's guilty Pleas in Abeyance on condition that Pennington be placed on probation and enter into and successfully complete drug court in Duchesne County, Utah.

k.      Pennington completed the appropriate paperwork and entered into drug court in Duchesne County. He was in that program for approximately two years.

l.      Even though Pennington was in drug court in Duchesne County, he frequently performed handyman work, including roofing and other gainful employment, in the Park City area, as well as Salt Lake County.

m.      Since he was released from prison in 2005, Pennington dated and lived with his girlfriend, Kristina L. Russell. When he was working in the Salt Lake area, Pennington would stay with Ms. Russell in her home in the South Jordan area. While in Duchesne, he would reside on property he had in Duchesne County.

n.      Russell owned a 1994 dark Nissan Pathfinder SUV. While Ms. Russell would drive the Pathfinder on occasion, it was normally Pennington who would drive that vehicle.

o.      Upon information and belief, West Jordan Police and South Jordan Police were upset that Judge Adkins placed Pennington in drug court instead of committing him to state prison. As such, during the two years Pennington was in drug court, he was routinely pulled over in the Pathfinder when he was in South Jordan or West Jordan by officers from those respective agencies.

p.      The stops of Pennington in the Pathfinder were done without reasonable suspicion or probable cause and occurred on no less than ten occasions.

q.  Upon information and belief, the sole purpose of these stops was an attempt by West Jordan and South Jordan Police officers to catch Pennington engaged in criminal activity severe enough to have him dismissed from drug court, have probation revoked, and have Pennington committed to prison.

r.  In early 2009, Pennington was discharged from drug court in Duchesne County, for reasons not currently known to plaintiffs, but believed to be related to the use of alcohol.

s.  When Pennington was discharged from drug court, he was detained in the Duchesne County Jail pending transport to Salt Lake County.

t.  While Utah law requires an order to show cause to be filed within 72 hours of incarceration, Pennington was not transported to Salt Lake County for about 40 days. Upon information and belief, this delay was intentionally caused by law enforcement from West Jordan Police Department.

u.  On May 17, 2009, Pennington appeared in Third District Court in front of Judge Adkins. On that date, even though no order to show cause had been filed, Pennington admitted to violating his probation by having been dismissed from drug court. Judge Adkins accepted Pennington's admission and set the case for sentencing on June 2, 2009.

v.  Pennington requested release on his own recognizance or on bond. Before granting the request, Judge Adkins required Pennington to submit to a drug test. The test was positive for methamphetamine. Pennington protested that he had never used methamphetamine, and Judge Adkins allowed him to take a more comprehensive test. That test demonstrated Pennington was not under the influence of any illicit drugs or alcohol. Judge Adkins permitted Pennington to be released on bond pending sentencing.

w.  Prior to the shooting of Pennington on May 28, 2009, upon information and belief, law enforcement from both South Jordan Police Department and West Jordan Police Department were aware of Pennington's early release from prison, that as a convicted felon he was permitted into drug court, that he had been

dismissed from drug court and, in spite of testing positive for a banned substance in court, was released on bond pending sentencing with Judge Adkins.

33. In the early morning hours of May 28, 2009, Pennington, upon information and belief, was summoned by an old acquaintance to meet him. It is not known where the meeting was to take place, but apparently Pennington was only told that the acquaintance needed Pennington's help.

34. At 1:24 a.m. on May 28, 2009, Sergeant Allen Crist, the same South Jordan police officer who had caused the criminal charges to be filed against Pennington in 2007, was on duty in a marked South Jordan police cruiser near the intersection of 9800 South and the Bangerter Highway in South Jordan, Utah.

35. Crist claims to have seen a black SUV and a man standing near it in front of Salt Lake Motor Sports to the north and west of the intersection of 9800 South and Bangerter as Crist was headed northbound on Bangerter. Crist turned off Bangerter heading west onto 9800 South and then entered the parking lot near Salt Lake Motor Sports to investigate.

36. Crist could not see any indicia of a crime and decided to follow the SUV. He pulled in behind the SUV and eventually turned on his overhead lights in an attempt to pull over the SUV. However, the SUV sped up, and after a chase through the Elkridge Junior High parking lot, Crist disengaged the chase.

37. South Jordan Police Department "chase policy" permits officers to chase a suspect only when the officer has probable cause to believe a felony has been committed, a DUI has occurred or where a crime against a person has occurred. As Crist had no evidence that any of these

11

events had occurred, he did not pursue the SUV. Crist pulled off to the side of the road and provided the license plate number of the SUV to dispatch and requested assistance from Officer Mark Utley and his police dog to come to the scene to determine if there was any evidence of a crime at the Salt Lake Motor Sports. It was later determined that no crime had been committed.

38. Officer Brett Perez, who was in the vicinity in his South Jordan Police Department vehicle, radioed that he had just passed the SUV, which was headed east on 9800 South.

39. Crist ordered Perez to not chase the vehicle, but to simply see if he could verify the license plate number and to canvas the area where the SUV was last seen in case the driver abandoned the vehicle.

40. Perez has a history of violating South Jordan Police Department chase protocol. He had recently been demoted from Sergeant to Patrol Officer for violations of South Jordan Police Department chase policy with a commensurate reduction of pay of approximately $20,000.00.

41. Dispatch informed all of the South Jordan officers that the license plate for the SUV came back as a 1994 dark green Pathfinder registered to Kristina L. Russell of Kamas, Utah.

42. At this time, South Jordan Police Officer Jared Nichols was in the vicinity of Officer Perez in a marked South Jordan Police cruiser. When Nichols heard the dispatcher announce that the SUV belonged to Kristina Russell, he told Perez to "go to 3".

43. Channel 3 is known as a "talk channel" among South Jordan police officers. This channel is not monitored by dispatch nor are there any audio recordings of any of the voice traffic on channel 3. Officers use this channel when they don't want a record of conversations among themselves to be made.

44. Communication on channel 3 during a chase is prohibited by South Jordan Police Department "chase policy," as that policy requires all chases to be video and audio recorded. Nichols and Perez knew that any conversations they had on channel 3 would not be recorded and that it would be a direct violation of South Jordan chase policy.

45. Upon information and belief, when Nichols and Perez turned to channel 3, they discussed the fact the SUV was probably driven by Pennington, since Russell was his girlfriend and since they had encountered Pennington in the vehicle before. They decided to chase Pennington until Pennington hit one of their vehicles, which would justify a chase.

46. While Perez and Nichols were on channel 3, Pennington took a turn down a cul-de-sac. Perez saw the opportunity to claim he was assaulted and climbed out of his car as Pennington went down the dead end road. Nichols was right behind Pennington and Perez waved him past.

47. Pennington turned around in the cul-de-sac, with Nichols chasing right behind him.

48. In spite of the fact Perez had already been chasing Pennington and in spite of the fact Perez had waved Nichols into the cul-de-sac to chase Pennington, Perez claims he was almost hit by Pennington as he left the cul-de-sac, which would justify Perez and Nichols chasing Pennington. The on board video of Nichols demonstrates that Perez was never in danger of being hit by Pennington at any point.

49. Since the time when Perez first encountered Pennington on 9800 South, he had his on board video and audio recording. The conversation with Nichols on channel 3 would be recorded on the on board recording. Upon information and belief, Perez informed Nichols he

13

would have to bow out of the chase to edit his on board video, redacting the channel 3 conversation and that Perez would rejoin the chase when the task was accomplished.

50. Upon information and belief, after spending several minutes editing his video and audio recordings, Perez rejoined the chase and restarted the on board recordings.

51. Nichols' on board recordings have no audio during the time period he was talking to Perez on channel 3, as Nichols apparently did not turn on his audio when he took Perez to channel 3.

52. Meanwhile, Officer Mark Utley of the South Jordan Police Department was en route to the chase in a marked South Jordan Police Department vehicle. He had his on board video turned on. However, there is no audio that was recorded, or the audio has been edited out. If Utley was monitoring channel 3 while en route to the chase, he would have recorded the conversation of Perez and Nichols on channel 3.

53. The communications between law enforcement, during the events leading up to the shooting of Pennington, were recorded by South Jordan Police Department via a dispatch tape. That tape has been edited and approximately three minutes and seventeen seconds are missing from the tape. Upon information and belief, the missing three minutes and seventeen seconds would reveal that South Jordan law enforcement did in fact know the identity of Pennington before he was shot and killed.

54. The reason South Jordan police officers redacted the video and audio of any reference to Pennington was to remove any evidence that South Jordan Police Department may have had ulterior motives in causing harm to Pennington.

55. Thereafter, Nichols announced that he was "going to take him out."

56. Several minutes later, at approximately 1:36 a.m., Perez rejoined the chase where Nichols had Pennington trapped in a cul-de-sac at or about 2408 West 7720 South at Mirriam Drive and Kendall in West Jordan.

57. Nichols and Perez rammed Pennington's vehicle several times, disabling Pennington's vehicle. The Pathfinder and Nichols' vehicle came to rest side by side, about three feet apart, with Nichols and Pennington facing each other.

58. Pennington was unarmed. Perez exited his vehicle and approached the passenger side of the Pathfinder. Perez could see Pennington's hands and did not believe he had a weapon. Perez instructed Pennington to "get out on the ground. Stay where I can see you."

59. Nichols, from inside his police cruiser with all windows rolled up, stated, "freeze or I will shoot you. Freeze." Nichols then discharged his 9mm Glock pistol, provided to him by South Jordan Police Department, two times, striking Pennington in the chest. Nichols then stated "Freeze, Wade. I'm going to shoot you. Get down on the fucking ground."

60. Perez then yelled at Pennington, "You're dead mother fucker."

61. Nichols then exited the driver's side of his vehicle and having just shot an unarmed man attempted to move Pennington to make it appear that Pennington was lunging toward him at the time Nichols shot.

62. Nichols was not able to pull Pennington's body completely from the vehicle, as the door was wedged shut and Pennington's foot got caught up in the steering column. Nichols uttered

15

"Fuck." Nichols' microphone cord had Pennington's blood on it, which had transferred when Nichols attempted to drag Pennington from the Pathfinder.

63. Nichols then walked away from Pennington, going back to his police cruiser and requested medical care for Pennington.

64. Nichols then reapproached Pennington close enough to where Nichols' body microphone picked up the voice of Pennington. Pennington states, "I'm fucking shot. Why did you shoot me? You bunch of assholes."

65. Pennington died hanging out of the car, where Nichols had dragged him. It is not known at what point in time Pennington died as neither Nichols nor Perez did anything to assist Pennington, even though Nichols knew Pennington was still alive.

66. Nichols returned to his police vehicle and turned off his video recording. However, unbeknownst to Nichols, Perez had not turned off his video recording. As South Jordan and West Jordan police officers began to arrive, Nichols, Perez and another officer discussed what has just taken place. As Nichols was not aware that Perez's video was still recording, Nichols states words to the effect of "there goes my job."

67. Perez then gestures to his police vehicle indicating that Perez' video camera is still operating. Perez then states, "I'm sorry, man."

68. Over the next two hours, approximately 26 law enforcement officials from West Jordan, South Jordan, and the Salt Lake District Attorney's Office arrive at the crime scene. All of these entities have adopted the Law Enforcement Critical Incident Investigative Protocol (L.E.A.D.S). It is determined that the protocol will be invoked.

69.  Travis Peterson and Michael Leary from the Salt Lake County District Attorney's

Office, Sergeant Knight from South Jordan Police Department and Travis Rees of West Jordan

Police Department all arrive at the same time and make up the "protocol investigation team."

70. To avoid conflicts of interest, the L.E.A.D.S protocol requires there be two separate and

independent investigations performed.  There is a criminal investigation from the venue agency

and a separate investigation from the protocol task force.  The protocol mandates that no

investigator can serve on both of the teams to ensure no conflicts of interest develop.

71. From the outset, it was determined by Rees and Leary that they would violate the

L.E.A.D.S protocol and have Rees serve on both the investigative teams.

72. Rees and Leary determined they would handle all of the essential factual investigations

relating to the homicide.  Additionally, Rees and Leary determined they would conduct all

interviews of witnesses jointly.

73. Since Lohra L. Miller took political office as the Salt Lake District Attorney in January

2007, she has instituted the following policies relating to critical incident investigative protocol:

      a.      Investigators are encouraged to ignore the L.E.A.D.S mandate that
separate investigations are performed in officer related shootings.  This ensures
that there are no conflicting reports and that the district attorney's office will
maintain control over the outcome of any investigation.

      b.      Investigators are encouraged to focus their reports on the criminal history
of any victim of a police shooting by placing the victim in a bad light in order to
draw an emotional response from the public drawing attention away from the fact
the shooting may not have been justified.

      c.      Whenever officers shoot an unarmed victim, investigators are encouraged
to focus on assertive or threatening movement of the victim and to ask leading

questions that would elicit a response that the victim engaged in threatening movement, which caused the officer fear for his safety or the safety of another.

    d.     Whenever officers shoot an unarmed victim, investigators are encouraged to focus the investigation on subjective fears the officer may have, not on objective fears as required by Utah law.

    e.     Investigators are discouraged from developing evidence that tends to incriminate the offending officer.

74. Since Lohra L. Miller took office and initiated the above policies, police caused homicides have increased significantly in Salt Lake County. Officers know that if they do shoot a person without justification, the district attorney and her investigators will not, in all likelihood, prosecute them. In fact, Nichols knew this firsthand, already having been exonerated by Miller in a homicide two years prior.

75. The West Jordan Police Department, consistent with the policies from the district attorney, has adopted the following policies:

    a.     Investigators are encouraged to ignore the L.E.A.D.S mandate that separate investigations are performed in officer related shootings. This enables the district attorney's office to maintain control over the outcome of any investigation.

    b.     Investigators are encouraged to focus their reports on the criminal history of any victim of a police shooting in placing the victim in a bad light in order to draw an emotional response from the public drawing attention away from the fact the shooting may not have been justified.

    c.     Whenever officers shoot an unarmed victim, investigators are encouraged to focus on assertive or threatening movement of the victim and to ask leading questions that would elicit a response that the victim engaged in threatening movement, which caused the officer fear for his safety or the safety of another.

d.    Whenever officers shoot an unarmed victim, investigators are encouraged to focus the investigation on subjective fears the officer may have had, not on objective fears as required by Utah law.

e.    Investigators are discouraged from developing evidence that tends to incriminate the offending officer.

76. Consistent with the policies implemented by their respective employers and in direct conflict with the L.E.A.D.S protocol, Rees and Leary interviewed Perez together at the South Jordan Police Department at approximately 6:07 a.m. on the date of Pennington's homicide. This interview was followed up with the interview of Nichols two days later on May 30, 2009, at the West Jordon Police Department by Rees and Leary.  Those interviews reveal the following inappropriate conduct of the investigating officers:

a.    Perez told Rees that Nichols had shot another victim a couple of years prior.  Leary already knew this, as he was the protocol investigator on that homicide as well.  However, neither investigator asked Perez or Nichols any questions relating to the prior homicide to determine if there were any similarities to the Pennington shooting.

b.    Leary and Rees were aware that Perez had been demoted from Sergeant to Patrol Officer for violating South Jordan Police Department chase policy. However, neither investigator asked Perez one question about his previous violations of chase policy to determine if there were any similarities to the chase involving Pennington.

c.    Perez and Nichols told the investigators they were talking on channel 3 during the chase.  However, there were no follow up questions asked as to why they went to channel 3 and why they did not want their conversation recorded.

d.      The investigators had the video of Nichols with substantial portions of
audio missing.  However, they never asked Nichols why there was no audio on his
tape.

e.      The investigators had the edited South Jordan dispatch audio, but never
asked Nichols or Perez if they knew who edited it or why.

f.      The investigators also failed to ask Perez and Nichols why they chased
when Crist ordered them not to do so.

g.      In order to assist Nichols, either Rees or Leary provided Nichols a copy of
Nichols' own on board video to review before offering his statement.  This is a
violation of the L.E.A.D.S protocol.

h.      Perez told the investigators that Nichols moved Pennington after Nichols
shot him.  Nichols never told the investigators about moving the body.  The
investigators did not ask Nichols one question as to the allegations of Perez, as to
what Nichols' motives were when he moved Pennington's body.

i.      The investigators had the Nichols video, where he calls Wade by name.
Nichols denies knowing Pennington prior to the shooting.  However, the
investigators asked no questions as to how it is Nichols called Pennington by his
first name if Nichols did not know his identity.

j.      When Perez offered no reasonable explanation for his missing/edited
video, the officers did not follow up.

k.      Having reviewed the Nichols video where they knew Pennington was
alive after being shot, the investigators never asked Nichols why he did not render
first aid to Pennington after shooting him.

l.      Having reviewed the Perez video and Nichols' statement that "there goes
my job" no questions were asked of Nichols what he meant by that.

m.      Reese and Leary ignored most of the obvious questions associated with a
legitimate investigation and instead asked Perez and Nichols leading questions so

they could write in their reports that Pennington was engaged in furtive movements that caused Nichols to be scared for his safety, even though Nichols when first asked if he was scared stated, "I guess."

77. Rees and Leary obtained ballistics evidence from the State Medical Examiner's Office, which indicates that the shots that went into Pennington's torso went from left to right, which would be consistent with Pennington being shot while he was still sitting in the driver's seat of his vehicle, not jumping out of the window, as alleged by Nichols and Perez. However, they never followed up or had any trajectory evidence examined.

78. The investigators recognized that Crist started the chase, but never interviewed him to find out why he did not chase and why he instructed Perez and Nichols to not chase.

79. Leary provided a report to the Salt Lake County Attorney's Office. Consistent with the policies and practices of the Salt Lake District Attorney's office, Rees provided information as follows:

      a.      Pennington had a substantial criminal history.

      b.      Pennington made furtive movement towards Nichols.

      c.      Nichols was in fear of his life.

      d.      Leary never mentioned any of the evidence that would incriminate Nichols nor did he reveal that neither he nor Rees pursued any of that evidence.

80. As a result of the "protocol investigation," Lohra Miller made a determination to not pursue any criminal charges against Nichols and, in fact, absolved him of any wrong doing. Nichols was sent back to work on the South Jordan Police Department as a patrol officer.

21

81. The South Jordan Police Department has engaged in the Deliberate Indifference of Constitutional Rights through the practice, policies, customs or usages, lack of sufficient training, inadequate hiring and supervision, retraining, lack of discipline and lack of monitoring of the officers who killed Pennington in the following respects:

        a.      The department fosters the deprivation of constitutional rights by allowing its officers to target individuals with a criminal history, such as Pennington, for harassment, illegal stops, searches and seizures for illegitimate purposes.

        b.      The department retained Nichols as an officer on the police force knowing that he harbors ill will against those with criminal records, as demonstrated by Nichols taking color posters of criminals most wanted to the police range, shooting them full of holes with his department issued handgun and posting them on his Facebook page.

        c.      The department reinstated Nichols back on the police force two weeks after his first homicide with policies and procedures contrary to all known literature and science relative to properly reintroducing an officer back into the work force.

        d.      The department lacks any form of discipline for insubordination, such as that which occurred when Perez was initially demoted for violating department "chase policy" and when Perez and Nichols violated the direct orders of Crist to not chase Pennington.

        e.      The department has a policy of permitting officers to essentially destroy evidence by editing video in their police cars and choosing whether to deploy or not deploy audio tape.

        f.      The department has a policy that permits officers to pick and choose what evidence will be preserved by permitting officers to communicate on a channel that is not recorded, namely channel 3.

      g.     The department has such relaxed evidentiary standards that officers can edit dispatch recordings, such as what occurred in this case.

82. At all times during the events described above, the Defendants were engaged in a joint venture. The individual officers, investigators, and district attorney assisted each other in performing the various actions described and lent their physical presence and support and the authority of their office to each other during the said events.

83. As a direct and proximate result of the said acts of the Defendants, Wade Pennington suffered the following injuries and damages:

      a.     Violation of his constitutional rights under the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution to be free from an unreasonable search and seizure of his person;

      b.     Physical and emotional pain and suffering immediately after being shot by Officer Nichols

      c.     Loss of his life.

84. As a direct result of the said acts of the Defendants, Plaintiffs Garry and Judy Pennington and Tyler Pennington suffered the untimely end of their relationship with their son and father, with the corresponding loss of his income, services, protection, care, assistance, society, companionship, comfort, guidance, counsel and advice, and were forced to incur funeral expenses.

85. The actions of the defendant Officers and district attorney violated the following clearly established and well-settled federal constitutional rights of Wade Pennington:

a.      The right to be secure, in his person and house, against unreasonable seizure, as guaranteed by the Fourth Amendment;

b.      Freedom from the use of excessive, unreasonable and unjustified force against his person as established by *Tennessee v. Garner*, 471 U.S. 1 (1985).

c.      The right not to be deprived of his life and liberty without due process of law; as guaranteed by the Fifth Amendment; and

d.      The right not to have cruel and unusual punishment inflicted, as guaranteed by the Eighth Amendment; and

e.      The right to procedural and substantive due process of law under the Fourteenth Amendment.

86. The Defendants Salt Lake County, Salt Lake County District Attorney's Office, City of South Jordan, South Jordan Police Department, City of West Jordan and West Jordan Police Department established and maintained policies, customs, usages, and/or practices which constitute deliberate indifference to constitutional rights of its respective citizens which were the moving force behind Officer Perez's and Officer Nichols' actions and directly caused the constitutional violations to Pennington as alleged herein.

87. Pursuant to 42 U.S.C. § 1983, plaintiffs Gary and Judy Pennington, as Personal Representatives of the Estate of Wade Pennington, Deceased, are entitled to recover on behalf of the Estate damages caused by the violation of Wade Pennington's right not to be subject to the use of excessive and unreasonable force in connection with the the facts alleged herein under the Fourth Amendment to the United States Constitution and pursuant to 42 U.S.C. § 1988, to recover the attorneys' fees and costs incurred in prosecuting this action.

88. Under 42 U.S.C. § 1983, plaintiffs Gary and Judy Pennington, as Personal

Representatives of the Estate of Wade Pennington, Deceased, are entitled to recover on behalf of

the Estate sufficient damages to serve the deterrent functions central to the purpose of § 1983

including punitive damages.  The compensatory damages which may be recovered are those

commensurate with the damages in tort cases which are designed to provide compensation for

the injury caused to the deceased by the defendants' breach of duty.  To that end, compensatory

damages may include medical expenses, burial expenses, pain and suffering of Wade Pennington

before his death, loss of earnings based upon the probable duration of Wade Pennington's life

had his death not occurred, and other damages recognized in common law tort actions.

**FIRST CAUSE OF ACTION**
**42 U.S.C. §1983  -- MONELL CLAIM AGAINST SALT LAKE COUNTY, SALT LAKE COUNTY DISTRICT ATTORNEY'S OFFICE, CITY OF SOUTH JORDAN, SOUTH JORDAN POLICE DEPARTMENT, CITY OF WEST JORDAN, AND WEST JORDAN POLICE DEPARTMENT**

89. The preceding paragraphs are incorporated herein by reference.

90. The deprivation of constitutional rights, as above alleged, occurred as a result of, during,

or as a consequence of the execution of the policies, customs, or usages of Defendants Salt Lake

County, Salt Lake County District Attorney's Office, City of South Jordan, South Jordan Police

Department, City of West Jordan, and West Jordan Police Department, representing a deliberate

or conscious choice by the defendants, adopted or maintained in deliberate indifference to the

rights and interests of its citizens, including deliberate indifference to citizens' health, and/or

safety, and which ratify unlawful acts and omissions by its officers.

91. The policies, customs, or usages of Defendants Salt Lake County, Salt Lake County

District Attorney's Office, City of South Jordan, South Jordan Police Department, City of West

Jordan, and West Jordan Police Department  deprived Wade Pennington of his rights, security,

and liberties guaranteed to him by the Constitution of the United States, made actionable

pursuant to 42 U.S.C. § 1983 and *Monell v. Department of Social Services*, 436 U.S. 658, 98

S.Ct. 2018, (1978) as elsewhere enumerated in this Complaint.

92. The policies and customs and usages of Defendants Salt Lake County, Salt Lake County

District Attorney's Office, City of South Jordan, South Jordan Police Department, City of West

Jordan, and West Jordan Police Department constituted deliberate indifference and deprived

Pennington of the following rights and freedoms guaranteed by the Constitution of the United

States, and made actionable pursuant to 42 U.S.C. § 1983:

      a.      The right to be secure, in his person and house, against unreasonable
      seizure, as guaranteed by the Fourth Amendment;

      b.      The right not to be deprived of his life and liberty without due process of
      law; as guaranteed by the Fifth Amendment; and

      c.      The right not to have cruel and unusual punishment inflicted, as
      guaranteed by the Eighth Amendment; and

      d.      The right to procedural and substantive due process of law under the
      Fourteenth Amendment.

93. As a direct and proximate result of the above deliberate indifference and violations  of

constitutional rights, Pennington has suffered actual physical and emotional injuries as well as

the loss of his life in an amount to be proven at trial.

26

94. The conduct of the Defendants as set forth herein, represents reckless and callous indifference to Wade Pennington's federally protected rights, justifying an award of punitive damages.

## SECOND CLAIM FOR RELIEF
## 42 U.S.C. § 1983 – AGAINST ALL DEFENDANTS

95. The preceding paragraphs are incorporated herein by reference.

96. Defendants Perez and Nichols, while acting under color of state law, utilized unreasonable and excessive force which resulted in injury and death to Pennington.

97. The acts and omissions of the officers constituted deliberate indifference and deprived decedent of the following rights and freedoms guaranteed by the Constitution of the United States, and made actionable pursuant to 42 U.S.C. §1983:

      a.     The right to be secure, in his person and house, against unreasonable seizure, as guaranteed by the Fourth Amendment;

      b.     The right not to be deprived of his life and liberty without due process of law; as guaranteed by the Fifth Amendment; and

      c.     The right not to have cruel and unusual punishment inflicted, as guaranteed by the Eighth Amendment; and

      d.     The right to procedural and substantive due process of law under the Fourteenth Amendment.

98. As a direct and proximate result of the above deliberate indifference and violations of constitutional rights, together with the objectively unreasonable use of force, Pennington has suffered damages and injuries, including physical and mental pain and suffering after being shot

and prior to dying as well as the loss of his life and concomitant loss of income, in an amount to

be proven at trial.

99. As a result of the above and foregoing, plaintiff seeks an award of compensatory and

special damages, attorney's fees pursuant to 42 U.S.C. § 1988, costs, expert witness fees and

legal interest from the date of the Defendants' actions and omissions.

100.   The conduct of the Defendants also represents reckless and callous indifference to

Wade Pennington's federally protected rights, justifying an award of punitive damages.

**THIRD CAUSE OF ACTION**
**42 U.S.C. § 1983 – AGAINST ALL DEFENDANTS, EXCESSIVE FORCE DURING**
**SEARCH AND SEIZURE**

101.   The preceding paragraphs are incorporated herein by reference.

102.   The Fourth Amendment of the United States Constitution protects individuals against

unreasonable searches and seizures.   The Fourth Amendment right to be free from the use of

excessive force is so long and well established that there can be no question that a reasonable

police officer would know of its existence.   Any reasonable and/or reasonably trained police

officer should have known in May, 2009 that force like that utilized by officer Nichols was

excessive and unreasonable under the circumstances.

103.   Defendants seized the decedent for Fourth Amendment purposes when they disabled

his vehicle and shot him in the chest.   During this seizure, unreasonable force which violated

clearly established law of which a reasonable person would have known was used against

Pennington.

28

104. The conduct of Officer Nichols violated Wade Penningtons' right under the Fourth Amendment to the United States Constitution to be free from the use of excessive and unreasonable force in connection with the attempt to arrest him.

105. As a direct and proximate result of the above deliberate indifference and violations of constitutional rights, together with the objectively unreasonable use of force, Pennington has suffered damages and injuries, including physical and mental pain and suffering after being shot and prior to dying as well as the loss of his life and concomitant loss of income, in an amount to be proven at trial.

106. As a result of the above and foregoing, plaintiff seeks an award of compensatory and special damages, attorney's fees pursuant to 42 U.S.C. § 1988, costs, expert witness fees and legal interest from the date of the Defendants' actions and omissions.

107. The conduct of the Defendants also represents reckless and callous indifference to Wade Pennington's federally protected rights, justifying an award of punitive damages.

**FOURTH CAUSE OF ACTION**
**42 U.S.C. § 1983 – AGAINST CITY OF SOUTH JORDAN AND SOUTH JORDAN POLICE DEPARTMENT, SOUTH JORDAN POLICE CHIEF LINDSEY SHEPPARD – FAILURE TO PROPERLY TRAIN, SUPERVISE AND INVESTIGATE**

108. The preceding paragraphs are incorporated herein by reference.

109. The Defendants City of South Jordan, South Jordan Police Department, and Police Chief Lindsey Sheppard establish policies, procedures, customs and/or practices for South Jordan police officers.

29

110. The John Doe officers, under the oversight of the South Jordan Police Chief, are responsible for the training and supervision of South Jordan officers, including but not limited to Defendants Perez and Nichols.

111. The policies, procedures, customs, and/or practices established by the Police Chief and imparted by John Doe supervisors are implemented by the South Jordan Police Department.

112. The City of South Jordan and the South Jordan Police Department were required under the Constitution to have procedures which informed Perez and Nichols of the Constitutional requirements regarding use of force and which supervised their compliance with those requirements. The City was also required in its process for selecting to hire Perez and Nichols as police officers that they have the characteristics which indicated a respect for Constitutional rights. Upon information and belief, the inadequacy of the City's selection, training and supervision policies, practices and procedures resulted in Perez's and Nichols' use of excessive and unreasonable force, causing the death of Wade Pennington.

113. The South Jordan Police Department and City of South Jordan developed and maintained policies, procedures, customs, and practices exhibiting a deliberate indifference to the constitutional rights of persons in the City of South Jordan, which caused the violation of the Plaintiff's constitutional rights as set forth above.

114. Defendants South Jordan Police Department and City of South Jordan were aware of the lack of training given to South Jordan Police officers in dealing with members of the public, to be free from constitutional violations committed as described in this Complaint.

115. If any training was given to police officers regarding civil rights of members of the public to be free from constitutional violations, Defendants know that such training was reckless and grossly negligent and that further misconduct in that area was almost inevitable.

116. The infliction of injuries and deprivation of constitutional rights to the Plaintiff occurred as a result of or as a consequence of the execution of the policies, procedures, customs, usages of Defendant, policies representing a deliberate or conscious choice by Defendants and which ratify unlawful acts by its officers, including but not limited to the following policies, customs or usages concerning the use of excessive force:

> a.     A policy of providing inadequate training in the use of excessive foreece through the failure to require constitutional adequate training;
>
> b.     A policy of non-prosecution and a tacit authorization of the use of excessive force by its officers involved in incidents of excessive force leading to great bodily injury or death;
>
> c.     A policy, custom, or usage of failure to discipline, sanction, or discharge officers involved in unjustified police brutality, including the failure to termination, or even sanction or reprimand police officers resulting in the practical and legal effect of ratification by Defendants, endorsing the irresponsible use of force as part of a tacit City and County policy of condoning irresponsibility;
>
> d.     A policy of condoning and permitting the exercise of excessive force by police officers, regardless of the circumstances;
>
> e.     A "cover-up" policy following police killings; and
>
> f.     A failure to follow up and adequately discipline officers who have been found responsible in excessive force situations.

31

117. As a direct and proximate result of the above deliberate indifference and violations of constitutional rights, together with the improper and inadequate training, supervision, investigation and discipline of South Jordan police officers involved in critical incidents, Pennington has suffered damages and injuries, including physical and mental pain and suffering after being shot and prior to dying as well as the loss of his life and concomitant loss of income, in an amount to be proven at trial.

118. As a result of the above and foregoing, plaintiff seeks an award of compensatory and special damages, attorney's fees pursuant to 42 U.S.C. § 1988, costs, expert witness fees and legal interest from the date of the Defendants' actions and omissions.

119. The conduct of the Defendants also represents reckless and callous indifference to Wade Pennington's federally protected rights, justifying an award of punitive damages.

## FIFTH CAUSE OF ACTION
## 42 U.S.C. § 1983 – AGAINST SALT LAKE COUNTY, SALT LAKE COUNTY DISTRICT ATTORNEY'S OFFICE, LOHRA MILLER, MICHAEL LEARY, CITY OF WEST JORDAN, WEST JORDAN POLICE DEPARTMENT, WEST JORDAN POLICE CHIEF KEN MCGUIRE, AND WEST JORDAN OFFICER TRAVIS REES – FAILURE TO INVESTIGATE

120. The preceding paragraphs are incorporated herein by reference.

121. The Defendants Salt Lake County, Salt Lake County District Attorney's Office, and Salt Lake District Attorney Lohra Miller, directly and through subordinates jointly and/or severally established policies, procedures, customs and/or practices for the investigation of incidents involving deaths caused by police officers which exhibit deliberate indifference to the

constitutional rights of persons in the County of Salt Lake, which caused the violation of

Pennington's constitutional rights.

122. Since Lohra L. Miller took political office as the Salt Lake District Attorney in

January, 2007, she has instituted the following policies, procedures, customs, and/or practices

relating to critical incident investigative protocol:

> a.      Investigators are encouraged to ignore the LEADS mandate  that separate
> investigations are performed in officer related shootings.  This ensures that there
> are no conflicting reports and that the district attorney's office will maintain
> control over the outcome of any investigation.
>
> b.      Investigators are encouraged to focus their reports on the criminal history
> of any victim of a police shooting in placing the victim in a bad light in order to
> draw an emotional response from the public drawing attention away from the fact
> the shooting may not have been justified.
>
> c.      Whenever officers shoot an unarmed victim, investigators are encouraged
> to focus on assertive or threatening movement of the victim and to ask leading
> questions that would elicit a response that the victim engaged in threatening
> movement which caused the officer fear for his safety or the safety of another.
>
> d.      Whenever officers shoot an unarmed victim, investigators are encouraged
> to focus the investigation on subjective fears the officer may have, not on
> objective fears as required by Utah law.
>
> e.      Investigators are discouraged from investigation of developing evidence
> that tends to incriminate the offending officer.

123. The West Jordan Police Department consistent with the policies of the District attorney

has adopted the following policies:

a.      Investigators are encouraged to ignore the LEADS mandate that separate investigations are performed in officer related shootings. This enables the district attorney's office to maintain control over the outcome of any investigation.

b.      Investigators are encouraged to focus their reports on the criminal history of any victim of a police shooting in placing the victim in a bad light in order to draw an emotional response from the public drawing attention away from the fact the shooting may not have been justified.

c.      Whenever officers shoot an unarmed victim, investigators are encouraged to focus on assertive or threatening movement of the victim and to ask leading questions that would elicit a response that the victim engaged in threatening movement which caused the officer fear for his safety or the safety of another.

d.      Whenever officers shoot an unarmed victim, investigators are encouraged to focus the investigation on subjective fears the officer may have, not on objective fears as required by Utah law.

e.      Investigators are discouraged from investigation of developing evidence that tends to incriminate the offending officer.

124.   The infliction of injuries and deprivation of constitutional rights to the Plaintiff occurred as a result of or as a consequence of the execution of these policies, procedures, customs, usages of Defendants Salt Lake County, Salt Lake County District Attorney, West Jordan City, and West Jordan Police Department, policies representing a deliberate or conscious choice by these Defendants and which ratify unlawful acts by the officers it has cause to investigate, including but not limited to the following policies, customs or usages concerning the use of excessive force:

a.      A policy of providing inadequate training in the use of excessive force through the failure to require constitutional adequate training;

34

b.      A policy of non-prosecution and a tacit authorization of the use of excessive force by its officers involved in incidents of excessive force leading to great bodily injury or death;

c.      A policy, custom, or usage of failure to discipline, sanction, or discharge officers involved in unjustified police brutality, including the failure to termination, or even sanction or reprimand police officers resulting in the practical and legal effect of ratification by Defendants, endorsing the irresponsible use of force as part of a tacit City and County policy of condoning irresponsibility;

d.      A policy of condoning and permitting the exercise of excessive force by police officers, regardless of the circumstances;

e.      A "cover-up" policy following police killings; and

f.      A failure to follow up and adequately discipline officers who have been found responsible in excessive force situations.

125.  As a direct and proximate result of the above deliberate indifference and violations of constitutional rights, together with the established practice of improper and inadequate investigations in both the Salt Lake County District Attorney's Office as well as the West Jordan Police Department as the venue agency, Pennington has suffered damages and injuries, including physical and mental pain and suffering after being shot and prior to dying as well as the loss of his life and concomitant loss of income, in an amount to be proven at trial.

126.  As a result of the above and foregoing, plaintiff seeks an award of compensatory and special damages, attorney's fees pursuant to 42 U.S.C. § 1988, costs, expert witness fees and legal interest from the date of the Defendants' actions and omissions.

127.  The conduct of the Defendants also represents reckless and callous indifference to

Wade Pennington's federally protected rights, justifying an award of punitive damages.

## SIXTH CAUSE OF ACTION
## 42 U.S.C. § 1983 – AGAINST ALL DEFENDANTS – REFUSING OR NEGLECTING TO PREVENT

128.  The preceding paragraphs are incorporated herein by reference.

129.  At all times relevant to this Complaint, Defendants Perez and Nichols were acting

under direction and control of the South Jordan Police Department as well as the Salt Lake

County District Attorney's Office.

130.  Acting under color of law and pursuant to official policy or custom, Defendant Salt

Lake County, Salt Lake County Attorney's Office, City of South Jordan, South Jordan Police

Department, West Jordan City, and West Jordan Police Department knowingly, recklessly, or

with gross negligence failed to instruct, supervise, control, investigate, and discipline on a

continuing basis Defendant police officers in their duties to refrain from:

      a.     Unlawfully and maliciously harassing a citizen who was acting in accordance with his constitutional and statutory rights, privileges, and immunities;

      b.     Conspiring to violate the rights, privileges, and immunities guaranteed to Plaintiff by the Constitution and laws of the United States and the Laws of the State of Utah; and

      c.     Otherwise depriving Plaintiff of his constitutional and statutory rights, privileges, and immunities.

131.  Defendants had knowledge or, had they diligently exercised their duties to instruct,

supervise, investigate, control and discipline on a continuing basis, should have had knowledge

36

that the wrongs conspired to be done, as heretofore alleged, were about to be committed. All named Defendants had power to prevent or aid in preventing the commission of said wrongs, could have done so by reasonable diligence, and knowingly, recklessly, or with gross negligence failed or refused to do so.

132. Defendants directly or indirectly, under color of law, approved or ratified the unlawful, deliberate, malicious, reckless and wanton conduct of Defendants Perez and Nichols heretofore described.

133. As a direct and proximate cause of the negligent and intentional acts of Defendants as set forth in paragraphs above, Plaintiff suffered physical and mental injuries in connection with the deprivation of his constitutional and statutory rights guaranteed by the Fifth and Fourteenth Amendment of the Constitution of the United States and protected by 42 U.S.C. § 1983

134. As a result of the above and foregoing, plaintiff seeks an award of compensatory and special damages, attorney's fees pursuant to 42 U.S.C. § 1988, costs, expert witness fees and legal interest from the date of the Defendants' actions and omissions.

135. The conduct of the Defendants also represents reckless and callous indifference to Wade Pennington's federally protected rights, justifying an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, the plaintiff prays for relief against the Defendants:

1. For an award of compensatory and punitive damages in an amount to be determined at trial, but not less than $1,000,000.00;

2. For attorney's fees and costs pursuant to 42 U.S.C. § 1988

3. For interest, both pre-judgment and post-judgment, as allowed by law;

4. Other such relief as the interests of justice require.

**PLAINTIFF DEMANDS TRIAL TO A JURY ON ALL ISSUES SO TRIABLE**

DATED this 28ᵗʰ day of July, 2010.

Counsel for Plaintiffs
Aaron J. Prisbrey
Elizabeth B. Grimshaw
AARON J. PRISBREY, P.C.
1090 East Tabernacle Street
St. George, UT 84770
Telephone: (435) 673-1661
taysha@prisbreylaw.com
elizgrimshaw@gmail.com

Plaintiff's Address:
Garry & Judy Pennington
PO Box 1083
Kamas, UT 84036-1083

Tyler Pennington
Box 122
4831 Lacey Ln., Apt. 306
Riverton, UT 84096-7248

38

## CERTIFICATE OF SERVICE

  I certify that on this 2̶7̶th day of M̶a̶y̶, J̶u̶l̶y̶, 2010, I electronically filed the foregoing
AMENDED COMPLAINT (JURY DEMANDED) to the Clerk of the Court using the CM/ECF
system.

Elizabeth B. Grimshaw

39