AARON J. PRISBREY, P.C.
Aaron J. Prisbrey, #6968
Elizabeth B. Grimshaw, #8854
Attorneys for Plaintiffs
1090 East Tabernacle Street
St. George, Utah 84770
Telephone (435) 673-1661
taysha@prisbreylaw.com
elizgrimshaw@gmail.com

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| GARRY PENNINGTON, as co-personal representative of the estate and an individual heir of the deceased WADE PENNINGTON, JUDY PENNINGTON, as co-personal representative of the estate and an individual heir of the deceased WADE PENNINGTON, and TYLER PENNINGTON, as legal heir of WADE PENNINGTON,<br><br>Plaintiffs/Petitioners,<br><br>v.<br><br>SOUTH JORDAN CITY, LINDSAY D. SHEPHERD, JARED NICHOLS, BRETT PEREZ, and JOHN DOES, I – X,<br>Defendant/Respondent. | **SECOND AMENDED COMPLAINT (JURY DEMANDED)**<br><br><br>Case No.: 2:10-cv-497<br>Judge: Dee Benson |

The Plaintiffs, Garry Pennington, Judy Pennington and Tyler Pennington, by and through

the undersigned and for their complaint in this matter against the Defendants and DOES I-X,

inclusive, allege and state as follows:

1

## INTRODUCTION

1.  The preceding paragraphs are incorporated herein by reference.

2.  This is a 1983 civil rights action seeking compensatory and punitive damages from Defendants Nichols and Perez and compensatory damages from Defendants Shepherd and South Jordan City stemming from the violation of Wade Pennington's rights under the Fourth Amendment and the Fourteenth Amendment to the United States Constitution regarding the fatal police shooting of WADE PENNINGTON, in his vehicle in the early morning hours of May 28, 2009, in West Jordan, Salt Lake County, Utah, by South Jordan Police Officer Jared Nichols.

## PARTIES

3.  The preceding paragraphs are incorporated herein by reference.

4.  At all times relevant, decedent, WADE PENNINGTON, was a resident of Duchesne County, Utah, who would frequently stay with friends and family in South Jordan and West Jordan, Utah.

5.  Plaintiff, GARRY PENNINGTON, is Wade Pennington's father and sues both in his individual capacity as the father of the decedent and in a representative capacity as the duly appointed general co-personal representative of the estate of Wade Pennington, pursuant to the Order of the Honorable A.L. Payne, Eighth District Court, State of Utah.

6.  Plaintiff, JUDY PENNINGTON, is Wade Pennington's mother and sues both in her individual capacity as the mother of the decedent and in a representative capacity as the duly

appointed general co-personal representative of the estate of Wade Pennington, pursuant to the Order of the Honorable A.L. Payne, Eighth District Court, State of Utah.

7. Plaintiff, TYLER PENNINGTON, is Wade Pennington's son and sues in his capacity as legal heir of Wade Pennington.

8. At all times relevant, Defendant SOUTH JORDAN CITY was and is a municipal corporation organized under the laws of the State of Utah, which owns, operates, manages, directs and controls the South Jordan Police Department and is responsible for injury occasioned thereby. It is also the public employer of Defendants Lindsay Shepherd, Jared Nichols and Brett Perez, and is subject to liability in this case pursuant to the United States holding in *Monnell v. City of New York Department of Social Services*, 436 U.S. 658 (1978), that it is a "person" for purposes of Section 1983 of the Civil Rights Act.

9. At all times relevant, Defendant LINDSAY D. SHEPHERD was the duly appointed Chief of Police of the South Jordan Police Department, who was the Chief Executive Officer of the South Jordan Police Department. Chief Shepherd is the individual who has final policy making authority for South Jordan Police Department. At all times relevant herein, Chief Shepherd was acting in his official capacity in the course and scope of his employment under the color of State and Municipal law.

10. At all times relevant, Defendant JARED NICHOLS was a duly appointed police officer with the South Jordan Police Department, who was acting in his individual capacity in the course and scope of his employment under the color of State and Municipal law. On the date of Pennington's shooting, Nichols was on duty as a South Jordan Police Officer, dressed in a South

Jordan Police uniform, operating a South Jordan Police vehicle and using a weapon and equipment supplied to him by South Jordan City or the South Jordan Police Department.

11. At all times relevant, Defendant BRETT PEREZ was a duly appointed police officer with the South Jordan Police Department, who was acting in his individual capacity in the course and scope of his employment under the color of State and Municipal law. On the date of Pennington's shooting, Perez was on duty as a South Jordan Police Officer, dressed in a South Jordan Police uniform, operating a South Jordan Police vehicle and using a weapon and equipment supplied to him by South Jordan City or the South Jordan Police Department.

12. The true identity of Defendants DOES I-X, inclusive, is unknown to Plaintiffs, who therefore sue these Defendants by such fictitious names. These Defendants engaged in a conspiracy to violate Wade Pennington's Constitutional protected rights who have altered audio and video of South Jordan dispatch and have concealed relevant evidence obtained from Ben Kerbs. They may have also altered relevant video of South Jordan Police Officer Allen Crist and others. Plaintiffs will seek leave to amend this Complaint to show the true names and capacities of these Defendants when they have been ascertained. Each of the fictitious named Defendants is responsible in some manner for the conduct and liabilities alleged herein.

13. At all times relative to this Complaint, the actions of the Defendants toward Pennington were under color of the statutes, ordinances, customs and usage of South Jordan City Officer Nichols and Officer Perez.

## JURISDICTION AND VENUE

14. The preceding paragraphs are incorporated herein by reference.

15. This civil action arises under the United States Constitution and Federal law for redress of injuries pursuant to 42 U.S.C. §§ 1983, 1985, 1986, 1988; and 18 U.S.C. §§ 1961-1968 and pursuant to the Fourth and Fourteenth Amendments of the United States Constitution. Additionally, this Court has pendent jurisdiction to entertain claims arising under Utah State Law pursuant to 28 U.S.C. § 1367.

16. Jurisdiction is appropriate in this Court pursuant to 28 U.S.C. §§ 1331, 1344 and 1367.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

17. The preceding paragraphs are incorporated herein by reference.

18. At 1:38 a.m. on May 28, 2011, Wade Pennington was shot and killed by South Jordan Police Officer Jared Nichols in West Jordan after a high speed vehicular chase.

19. Pennington, at the time of his death, was 41 years of age and had spent the majority of his adult life residing in Salt Lake County and Duchesne County, Utah.

20. Prior to his death, Pennington was well known to law enforcement in the Salt Lake Valley. Pennington had been arrested and convicted on dozens of misdemeanor and felony charges stemming from investigations by the South Jordan Police Department, Sandy Police Department, West Jordan Police Department and other entities throughout the valley. Pennington had also been incarcerated at the Utah State Prison, as well as the Salt Lake County Jail at Oxbow for various periods from 1999 to 2007.

21. Pennington was incarcerated between 1999 and 2001 at Oxbow during the same time period Nichols was employed as a correctional officer at the facility. Upon information and belief, Nichols and Pennington first met at Oxbow.

22. While incarcerated in prison, Pennington was associated with several gang members. Upon information and belief, that was for his physical protection while in prison. Pennington had a tattoo that read "110%" below his left clavicle which upon information and belief is gang related.

23. From approximately 2004 to 2009, Officer Jared Nichols was assigned by the South Jordan Police Department to the Metro Gang Task Force. Upon information and belief, Nichols and Pennington had several encounters, because of Nichols' involvement with the Gang Task Force.

24. Nichols denies ever knowing who Pennington was.

25. In 2006 and 2007, Pennington committed numerous burglaries in Sandy and South Jordan.

26. Sergeant Allen Crist of South Jordan Police Department had sworn out a criminal Information under oath that Pennington had committed five felonies and two misdemeanors in South Jordan at various businesses in South Jordan in December, 2006.

27. Crist denies ever knowing who Wade Pennington was prior to Pennington's death.

28. Prior to his death, Pennington owned and operated a business called "Wade's Handyman" doing handyman work in Salt Lake, Duchesne and Summit counties. That is how he made his living.

29. Pennington was released from the Utah State Prison in 2005. From that date, Pennington dated and lived with his girlfriend, Kristina L. Russell. When he was working in the Salt Lake area, Pennington would stay with Ms. Russell in her residence in the South Jordan area. While in Duchesne, he would reside on property he owned with Russell.

30. Russell was the registered owner of a 1994 dark Nissan Pathfinder SUV. However, that vehicle was normally driven by Pennington.

31. Pennington had been stopped by South Jordan Officers in that vehicle, and it was known to at least some of the South Jordan Police Department that was the vehicle Pennington would drive.

32. Jared Nichols is currently an Officer employed by the South Jordan Police Department. Nichols first became engaged in law enforcement in June of 1999, when he was hired by the Salt Lake County Sheriff's Office as a correctional officer at the Salt Lake County Jail. Nichols worked at Oxbow as a correctional officer until July of 2001.

33. Upon information and belief, Nichols became familiar with Wade Pennington during his employment at the Oxbow facility, as Pennington was incarcerated for a substantial period of time during Nichols' employment there.

34. On July 9, 2001, Nichols was hired by the South Jordan Police Department as a Police Officer. He has been employed in that capacity through the present time.

35. Officer Nichols was assigned to the Gang Task Force for a period of time between about 2004 to early 2009. Upon information and belief, during this period of employment, Officer

Nichols met and was familiar with Wade Pennington, because of Pennington's possible gang affiliation while in prison.

36. On or about July 13, 2007, Nichols was contacted by Bret Miller of the Taylorsville Police Department, who, on information and belief, was also a member of the Metro Gang Task Force. Miller contacted Nichols to discuss a known White Supremacist, Darren Neil Grueber. Detective Miller requested the assistance of Nichols in serving a search and/or arrest warrant on Mr. Grueber in Taylorsville.

37. The warrant was to be served on Mr. Grueber at an apartment complex in Taylorsville. In the early morning hours of July 14, 2009, Officer Nichols spotted Mr. Grueber's vehicle entering the parking lot of the apartment complex. As Grueber parked, several police cars barricaded Mr. Grueber's vehicle in an attempt to effectuate his arrest. Mr. Grueber rammed several of the vehicles in an apparent attempt to escape. A witness who was in the apartment complex heard officers yell, "He's got a gun." Immediately thereafter, approximately 10 shots were fired. The shots were fired by Officer Nichols and another Officer, killing Mr. Grueber.

38. Nichols' claims the provocation for shooting Grueber was the ramming of police vehicles. He never acknowledged who stated the unarmed Grueber had a weapon or the role that played in shooting Grueber.

39. After the shooting of Mr. Grueber, Officer Nichols was placed on routine administrative leave from the South Jordan Police Department. Nichols was cleared of criminal wrong doing by the Salt Lake District Attorney's Office and after completion of a psychological evaluation, was placed back on active duty with the South Jordan Police Department.

40. In violation of policy instituted by Police Chief Shepherd, South Jordan never conducted any investigation regarding the shooting of Darren Neil Grueber. As such, there was never a resolution of conflict between Nichols and the independent witness as to the true provocation in shooting Grueber.

41. Officer Bret Perez was hired as a Police Officer by South Jordan Police Department in or about 1995. Officer Perez has a history of violating South Jordan Police pursuit policy:

> a. In 2000, within the South Jordan City limits, Officer Perez was driving his personal vehicle in violation of Utah state law and fled from South Jordan Police Officer Orthon, resulting in Orthon's police cruiser being involved in an automobile accident;
>
> b. Upon information and belief, South Jordan Police Department took no action to file criminal charges, train or discipline Perez for illegally running from a fellow officer;
>
> c. On April 24, 2005, Officer Perez was again operating his personal vehicle within the South Jordan Police Department city limits. South Jordan Police Officer Thomson, using radar, clocked Officer Perez's vehicle at 80 miles per hour in a 45 mile per hour zone. Additional Officers pursued Perez until Corporal Smith went to "channel 3" and informed other Officers that it was Officer Perez who was being chased;
>
> d. Again, Chief Shepherd, upon information and belief, took no steps to remedy Perez's conduct. He was not charged criminally or trained to remedy his illegal behavior;
>
> e. On April 1, 2008, Perez violated South Jordan Police pursuit policy again when he chased a vehicle for a misdemeanor speeding violation, resulting in the serious bodily injury to three people in a motor vehicle accident caused by the chase;
>
> f. As a result of this incident, Officer Perez was required to receive one day of remedial training with Sergeant Whittacker, receive two hours of conduct training, was suspended for four weeks and lost the use of a take home car for 60 days. No other action was taken to protect the public from Officer Perez.

42. On May 27, 2009, Wade Pennington was at the home of his girlfriend, Kristi Russell. He went out and ran some errands, and in the early morning hours of May 28, 2009, he informed Russell that he needed to go meet an old acquaintance.

43. Benjamin Kerbs was an old acquaintance of Wade Pennington. Ben Kerbs is a principle in various businesses throughout the valley. Most notably, pertaining to this case, he has a business interest in the Family Motorsports that was located at the intersection of 9800 South and Bangerter Highway in South Jordan, Utah.

44. Kerbs and Pennington had known each other since middle school and had used drugs together some 20 years ago.

45. Kerbs denies having seen Wade Pennington for a period of at least 20 years.

46. At approximately 1:23:55 a.m., on May 28, 2009, South Jordan Police Sergeant Allen Crist was on routine patrol headed northbound on Bangerter Highway near 9800 South in his South Jordan "slick top" police cruiser.

47. Crist claims to have seen a black SUV and a man, later determined to be Pennington, standing near it in front of the Family Motorsports at the corner of 9800 South and Bangerter. Crist turned off Bangerter onto 9800 South and then entered the parking lot near Family Motorsports to investigate.

48. Crist briefly followed the vehicle, which sped away from him with its lights off. Crist did not pursue the vehicle, because that would violate South Jordan chase policy in that no violent

felony had been committed and because Crist did not have probable cause to believe that a crime had been committed.

49. A later investigation revealed that no crime had been committed at the Family Motorsports facility, and no one had forcibly entered that building.

50. At the time Crist saw the suspicious vehicle, the only Officers on patrol duty for South Jordan Police were Sergeant Crist, Officer Perez, Officer Nichols and a Canine Officer, Mark Utley. Officer Sam Winkler had just gone off duty and was pulling into his home on the west side of the valley about the time Crist saw Pennington near the Family Motorsports parking lot.

51. The police vehicles driven by Nichols, Perez, Crist, Utley and Winkler were all equipped with police radios, onboard computers with real time communications capabilities with dispatch, video cameras with audio capabilities, red and blue lights and sirens. Additionally, these five Officers all had radios on their persons, which had the same capabilities of communication as the in car police radios.

52. The dispatcher assigned to South Jordan Police Department in the early morning hours of May 28, 2009, was Alisha Dimmitt. Dimmitt is an employee of Valley Emergency Communications Center ("VECC"), which is centrally located in the Salt Lake Valley.

53. As Dimmitt communicates with Officers from the South Jordan Police Department, she is responsible to document communications with the Officers in a software based computer program, which would provide real time information, either verbally by radio or via messaging to their onboard computers. Additionally, all communications with the South Jordan Police Department on the "primary channel" were recorded by VECC.

54. South Jordan Officers had the ability to communicate on an alternate channel known as "channel 3," which would not be recorded at VECC. However, when running lights and sirens, video and audio equipment would automatically turn on and any communication on "channel 3" would record on the onboard video equipment.

55. Within moments of encountering Pennington's vehicle, Crist radioed the plate number to Dimmitt.

56. At 1:25:31, Dimmitt ran a vehicle inquiry on that plate, which came back registered to Kristina L. Russell. Dimmitt put that information into the "narrative," making that information available to all members of South Jordan Police Officers who were on duty with access to onboard computers. Anyone who saw that message and knew of the relationship between Russell and Pennington would be aware that Pennington was probably the driver of the vehicle.

57. Crist then radioed that the SUV was headed westbound on 9800 South.

58. Officer Bret Perez was in the vicinity and passed the SUV.

59. Perez radioed that he had encountered the SUV. Crist ordered Perez to not chase, but to simply "saturate the area" to see if he dumps the vehicle.

60. The SUV headed westbound until it reached 2700 West and headed north. Perez, having activated his lights and sirens, followed the vehicle onto 2700 West. As the vehicle appeared to be headed into West Jordan and having been ordered to not chase, Perez pulled off to the side of the road. This is seen on Perez's onboard video.

61. Dimmitt, in communicating with South Jordan, demonstrates that Crist first encountered the black SUV at 1:23:55 and that at 1:38:29, some 14 minutes and 35 seconds later, shots had been fired by Nichols.

62. As part of the investigation of Nichols, Crist obtained the VECC dispatch tape. However, that tape has been altered, as it only contains 11 minutes 39 seconds from the time Crist encountered Pennington until Nichols shoots Pennington.

63. South Jordan has also provided a second dispatch tape, which has also been altered in a similar fashion.

64. Plaintiffs are not aware who has altered the South Jordan dispatch tapes, as they were initially in the possession of Allen Crist and were transferred to West Jordan and subsequently sent back to South Jordan. However, the alterations are material as the times missing relate to when Perez claims he was forcibly assaulted by Pennington, as set forth below.

65. According to the South Jordan dispatch tape, Perez contacted Dimmitt three minutes and 57 seconds after the initial encounter between Pennington and Crist and states, "He just tried to run me over."

66. The claim that Pennington tried to run over Perez is not recorded by the on-board audio/video equipment of Nichols, Crist, Utley, Winkler or Perez. The only place that is recorded is on the altered South Jordan dispatch tape.

67. Utley testified at his deposition that Perez's claim he was almost run over was made much later than alleged. He claims Nichols was chasing Pennington well before Perez's claim

he was assaulted. This demonstrates that the missing audio from South Jordan contains information contradicting Perez's claim of the timing of the alleged assault.

68. Winkler is heard on the South Jordan dispatch tape three minutes after the initial Crist/Pennington encounter. He was at home sitting in his car. He testified at his deposition that it was about five minutes later that Perez claimed he was almost run over. This is also consistent with the South Jordan audio missing three to four minutes, as this places Perez's claim of assault eight minutes, not four, after the original Crist/Pennington encounter.

69. Upon information and belief, Perez fabricated the claim that Pennington had attempted to run him over to justify chasing Pennington, as Perez had been previously involved in an unjustified chase for which he was reprimanded.

70. After Perez claims he was assaulted, Nichols understood that was a "green light" to chase. This also gave Nichols the authorization to use deadly force to stop Pennington.

71. Nichols and Perez both were subsequently interviewed by West Jordan Detective Travis Rees. Both Perez and Nichols told Rees that when Perez was allegedly assaulted, Pennington could see Perez as Pennington's lights were on. These statements and others made by Nichols and Perez are directly contradicted by Nichols' onboard recording.

72. Upon information and belief, Perez and Nichols conspired to create the appearance of a "forcible felony" that would justify chasing Pennington and that would also justify the use of deadly force against Pennington.

73. Upon information and belief, Nichols manually manipulated his video recording by turning his lights and siren on and off to assist in the cover-up of the falsified claim of aggravated assault by Perez.

74. Thereafter, Nichols did use deadly force and attempted to ram Pennington's vehicle in what he termed a "half assed" P.I.T maneuver.

75. At about 1:36 a.m., Nichols and Perez trapped Pennington in a cul-de-sac at or about 2408 West 7720 South at Miriam Drive and Pando in West Jordan.

76. Nichols and Perez rammed Pennington's vehicle several times, disabling Pennington's vehicle. The Pathfinder and Nichols' vehicle came to rest side by side, about three feet apart, with Nichols and Pennington facing each other.

77. Pennington was unarmed. Perez exited his vehicle and approached the passenger side of the Pathfinder. Perez could see Pennington's hands and did not believe he had a weapon. Perez instructed Pennington to "get out on the ground. Stay where I can see you."

78. Nichols, from inside his police cruiser with all windows rolled up, stated, "freeze or I will shoot you. Freeze." Nichols then discharged his 9mm Glock pistol, provided to him by South Jordan Police Department, two times, striking Pennington in the chest. Nichols then stated "Freeze, Wade. I'm going to shoot you. Get down on the fucking ground."

79. The physical evidence demonstrates that at the time Nichols shot Pennington, Pennington was still in the drivers' seat of his vehicle.

80. Nichols' claims Pennington lunged at him and this justified the use of deadly force.

81. Nichols then exited his vehicle through the passenger door and claims he had no further interaction with Pennington, as Pennington was obviously dead.

82. Perez, however, claims that Nichols attempted to move Pennington's body out of the vehicle, but he was unable to do so, as Pennington's feet got caught up in the steering column.

83. Contrary to Nichols' claim that he did not approach Pennington, Nichols can be heard on his onboard audio uttering, "Fuck," as he attempts to move Pennington's body.

84. Nichols then re-approached Pennington close enough to where Nichols' body microphone picked up the voice of Pennington. Pennington states, "I'm fucking shot. Why did you shoot me? You bunch of assholes."

85. Nichols renders no aid to Pennington.

86. Nichols attempt to move Pennington's body was done to make it appear as though Pennington had lunged at him, which may justify the use of deadly force against Pennington.

87. Immediately after Pennington was shot, Perez was recorded on Perez's own video stating, "Your dead mother fucker."

88. Perez also indicates several minutes after the death of Pennington, "There goes my job."

89. At approximately 3:00 a.m., Dimmitt contacted Ben Kerbs and had him go to the Family Motorsports facility to meet with South Jordan Police Department Officers. At his deposition, Kerbs testified that he had video surveillance of an individual outside of his business and that he watched it with what he believed to be South Jordan Police Department Officers, and that he turned copies of the video surveillance over to the Officers.

90. West Jordan Police Department conducted the criminal investigation of the shooting and death of Wade Pennington.

91. The reports from West Jordan pertaining to the criminal investigation make no mention of the video turned over to South Jordan from Kerbs.

92. Defendant has no explanation as to the whereabouts of the video provided to South Jordan Police Officers by Kerbs.

93. During the Perez and Nichols chase of Pennington, Crist was en route with his lights and sirens on. There should be video and audio of what transpired. However, there are no tapes that have been provided as it pertains to Crist en route to the chase scene.

94. It is unknown to Plaintiffs where those recordings are, and Defendant has no satisfactory explanation as to the whereabouts of them.

### FIRST CAUSE OF ACTION

**42 U.S.C. §1983 -- AGAINST DEFENDANTS JARED NICHOLS (FOURTH AMENDMENT EXCESSIVE FORCE DURING ILLEGAL SEARCH AND SEIZURE)**

95. The preceding paragraphs are incorporated herein by reference.

96. The Fourth Amendment of the United States Constitution protects individuals against unreasonable searches and seizures. The Fourth Amendment right to be free from the use of excessive force is so long and well established that there can be no question that a reasonable police officer would know of its existence. Any reasonably and/or reasonably trained police officer should have known in May, 2009, that force like that utilized by Officer Nichols was excessive and unreasonable under the circumstances.

97. Defendant Nichols seized Pennington for Fourth Amendment purposes when he disabled Pennington's vehicle and shot him two times in the chest while Pennington was seated in his car. During the seizure, unreasonable force which violated clearly established law of which a reasonable officer would have known was used against Pennington. At the time of the seizure of Pennington's person, the only crime which had been committed was that of fleeing from Officers.

98. Pennington did not impose an immediate threat to the safety of the Officers or others as Pennington's vehicle, which Officers claim to have been the deadly weapon, had been disabled.

99. Pennington did not pose an immediate threat to the safety of the Officers, as he was unarmed. Further, to the extent the Officers claim Pennington lunged at Nichols, Nichols was not in fear of immediate danger, as his window was rolled up, and Pennington was unarmed.

100. The conduct of the Officers was reckless and deliberate in effectuating the seizure of Pennington in the following respects:

a. Perez and Nichols, upon information and belief, created the perception of a "forcible felony," which would justify the use of deadly force against Pennington, where no such felony had been committed, which directly led to the unlawful use of deadly force against Pennington;

b. Nichols attempt to perform a "half assed" P.I.T. maneuver was a direct violation of South Jordan pursuit policy;

c. The chasing of Pennington by Perez and Nichols was in direct violation of the command to not do so by a superior officer in direct contravention of South Jordan chase policy;

and

d. As Nichols knew who Pennington was, he violated South Jordan chase policy by continuing to engage in the chase. South Jordan chase policy provides that a chase must cease as soon as there is identification of a suspect, and there is no need for immediate apprehension.

101. The conduct of Officer Nichols violated Wade Pennington's right under the Fourth Amendment of the United States Constitution to be free from the use of excessive and unreasonable force in connection with the attempt to arrest him.

102. As a direct and proximate result of the above deliberate indifference and violations of Constitutional rights, together with the objectively unreasonable use of force, Pennington suffered damages and injuries, including physical and mental pain and suffering after being shot and prior to dying as well as the loss of his life and concomitant loss of income, in an amount to be proven at trial.

103. As a result of the above and foregoing, Plaintiffs seek an award of compensatory and special damages, attorney's fees pursuant to 42 U.S.C. § 1988, costs, expert witness fees and legal interest from the date of the Defendants' actions and omissions.

104. The conduct of the Defendants also represents reckless and callous indifference to Wade Pennington's federally protected rights, justifying an award of punitive damages.

## SECOND CAUSE OF ACTION

**42 U.S.C. § 1983 AGAINST BRET PEREZ AND JARED NICHOLS (FOURTEENTH AMENDMENT DUE PROCESS)**

105. The preceding paragraphs are incorporated herein by reference.

106.  Perez and Nichols, in conspiring to create provocation to make it appear that chasing of Pennington was justified and the use of deadly force upon his person was justified, acted intentionally and recklessly.

107.  The intentional nature of their conduct is demonstrated by the altered video tape, the inconsistencies in the reports given to Detective Rees, which are contrary to the video tape evidence, and Nichols' manipulation of his video while pursuing Pennington.

108.  The conspiracy to create the appearance of a forcible felony in order to use deadly force on Pennington is an abuse and misuse of government power.

109.  The amount of force used was inspired by malice or excessive zeal that shocks the conscience.  This is demonstrated by Perez's statement immediately after Pennington's death that "Your dead mother fucker," by Nichols' failure to render aid to Pennington after had had shot him, by Perez's and Nichols' ramming of Pennington knowing that he had not committed a forcible felony, through Nichols' use of the unauthorized deadly force P.I.T. maneuver to try to stop Pennington, and by Perez's concern in his job, not the fact that Nichols had shot and killed Pennington.

110.  As a direct and proximate result of the above deliberate indifference and violations of Constitutional rights, together with the objectively unreasonable use of force, Pennington suffered damages and injuries, including physical and mental pain and suffering after being shot and prior to dying as well as the loss of his life and concomitant loss of income, in an amount to be proven at trial.

111.  As a result of the above and foregoing, Plaintiffs seek an award of compensatory and special damages, attorney's fees pursuant to 42 U.S.C. § 1988, costs, expert witness fees and legal interest from the date of the Defendants' actions and omissions.

112.  The conduct of the Defendants also represents reckless and callous indifference to Wade Pennington's federally protected rights, justifying an award of punitive damages.

### THIRD CAUSE OF ACTION

**(CONSPIRACY TO VIOLATE CONSTITUTIONALLY PROTECTED RIGHTS)**

113.  The preceding paragraphs are incorporated herein by reference.

114.  Defendants Perez and Nichols, acting in concert, had a meeting of the minds and agreement and a general conspiratorial objective to exercise deadly force against Wade Pennington without provocation or legal justification.

115.  Perez and Nichols, upon information and belief, agreed to claim that Perez was assaulted by Pennington when he was not.  This would create the appearance of justification for the chase when no such justification existed.

116.  These acts were done in concert and in abrogation of Pennington's Constitutional rights and, upon information and belief, in conjunction with the DOE Defendants who have altered evidence to attempt to create the appearance of justification of the chase of Pennington.

117.  In furtherance of the conspiracy, Perez radioed dispatch claiming Pennington had almost run him over.  He then engaged in an unlawful chase and deadly force ramming of

Pennington's vehicle. He then subsequently lied to investigators about the justification for the chase.

118. Nichols, in furtherance of the conspiracy, agreed to chase Pennington after the false claim was made by Perez of the assault. Nichols then chased Pennington without provocation, used deadly force in performing an unauthorized P.I.T. maneuver, rammed Pennington's vehicle and shot and killed Pennington without justification and lied to investigators about it.

119. As a direct and proximate result of the above deliberate indifference and violations of Constitutional rights, together with the objectively unreasonable use of force, Pennington suffered damages and injuries, including physical and mental pain and suffering after being shot and prior to dying as well as the loss of his life and concomitant loss of income, in an amount to be proven at trial.

120. As a result of the above and foregoing, Plaintiffs seek an award of compensatory and special damages, attorney's fees pursuant to 42 U.S.C. § 1988, costs, expert witness fees and legal interest from the date of the Defendants' actions and omissions.

121. The conduct of the Defendants also represents reckless and callous indifference to Wade Pennington's federally protected rights, justifying an award of punitive damages.

## FOURTH CAUSE OF ACTION

**42 U.S.C. § 1983 *MONNELL* CLAIM AGAINST CITY OF SOUTH JORDAN AND CHIEF LINDSAY SHEPHERD**

122. The preceding paragraphs are incorporated herein by reference.

123.  The preceding paragraphs demonstrate that Nichols and Perez violated Pennington's clearly protected Constitutional rights guaranteed under the Fourth and Fourteenth Amendments of the United States Constitution.

124.  As policy maker for the South Jordan Police Department, Chief Shepherd was responsible for making policy decisions, which were the moving force behind the Constitutional deprivation suffered by Pennington, as Pennington was the victim of an illegal chase and excessive use of force when he was shot and killed.  As set forth above, South Jordan City is the appropriate party to this lawsuit pursuant to *Monnell.*

125.  Chief Shepherd was the author of numerous South Jordan policies, which were policy in name only.  Chief Shepherd created policies which appear to protect the Constitutional rights of citizens.  However, while he had policies in place, he systematically refused to enforce those policies as it pertained to both Nichols and Perez.  Chief Shepherd, as policy maker, introduced at the South Jordan Police Department the following relevant policies, which were largely disregarded:

   a.  That all South Jordan Police Officers are required to abide by the law of the State of Utah and the United States;

   b.  Use of force shall be investigated by a Sergeant who shall conduct a thorough investigation under the supervisions of the operations commander;

   c.  The assigned Sergeants shall complete a detailed report that will go to the Chief;

   d.  Every supervisor in the chain of command shall review the report and add his or her recommendations as it pertains to the use of force by a Police Officer;

   e.  Subordinates are to obey all commands of superior Officers;

f.  P.I.T. maneuvers are not authorized to be used by South Jordan Police Department Officers under any circumstances;

g.  Pursuing Officers will activate all emergency equipment and video and audio;

h.  All vehicles during a pursuit must slow at intersections to a speed that would permit them to stop if needed;

i.  Officers shall not place themselves in a position that would jeopardize the safety of them or fellow Officers;

and

j.  Officers must immediately disengage if a subject can be positively identified.

126.  As it pertains to Officer Perez, Chief Shepherd's policy requires that all Officers abide by State and Federal law.  In 2000, Officer Perez lead Officers on an illegal chase resulting in the damage to a police vehicle.  He was not disciplined, trained, reprimanded or instructed to act any differently.  In 2005, Perez engaged in similar conduct where multiple Officers from South Jordan chased his vehicle.  There was no training, instruction or consequences for that illegal conduct from Chief Shepherd.  Then, in 2008, Perez again violated chase protocol resulting in the serious injury to three people when he chased without sufficient provocation.  Shepherd issued a minor reprimand to Perez.

127.  Chief Shepherd was deliberately indifferent to his own policies and by failing to follow those policies, Perez was not given additional training or removed from the force, which resulted in the ultimate violations of Constitutional rights by Pennington when Perez, initiated another unjustified chase and use of deadly force against Pennington.

128. As it pertains to Officer Nichols, Chief Shepherd's policy required that after the use of deadly force, a field investigation and detailed reports be completed and provided to the Police Chief. Additionally, use of deadly force shall be investigated by a Sergeant supervised by operations commanders and every supervisor in the chain of command.

129. After Nichols shot and killed Grueber, these policies were disregarded. Nichols was placed back on active duty when there was a clear conflict between Nichols and an independent witness as to what provoked Nichols to shot Grueber and whether the shooting of Grueber was justified.

130. Chief Shepherd was deliberately indifferent to his own policies, and by failing to follow those policies, Nichols was never given additional training nor discipline pertaining to the manner in which he shot and killed Darren Neil Grueber, which resulted a similar violation of the Constitutional rights of Pennington, when Nichols shot and killed Pennington with excessive force, then covered it up as appears to have happened in the Grueber shooting.

131. As it pertains to the Pennington investigation, Chief Shepherd's policy required that Officers obey the commands of superior Officers. Officers are prohibited from performing P.I.T. maneuvers. Officers are required to activate and record all aspects of a pursuit. Officers in pursuit are required to slow down at intersections to a speed that would permit them to stop before proceeding through. His policy also requires the disengagement of any chase where the suspect was known.

132. An internal investigation of Officer Nichols in the Pennington shooting was never done. If it were, it would reveal that Nichols chased Pennington in violation of Sergeant Crist's order.

Nichols performed a prohibited P.I.T. maneuver. Nichols did not activate his emergency equipment as required. Nichols did not slow his vehicle at intersections to a speed that would permit him to stop. Nichols knew who Pennington was, as he used his name in addressing him, but did not cease to chase.

133. By failing to address the numerous violations of South Jordan policy in the Pennington shooting, Chief Shepherd was deliberately indifferent to his own policies, which demonstrates that the policies were policy in name only and were not taken seriously by any of the Officers and were routinely ignored, ultimately establishing the policy that no such policies exist, and Officers will not be subject to any training or discipline for the violation of those policies.

134. The deprivation of Constitutional rights, as alleged above, occurred as a result of, during, or as a consequence of the execution of the policies or usages of the City of South Jordan and its Police Department, representing a deliberate or conscious choice by the Defendants, adopted or maintained in deliberate indifference to the rights and interests of its citizens, including deliberate indifference to citizens' health, and/or safety, and which ratify unlawful acts and omissions by its Officers.

135. As a result of the above and foregoing, Plaintiffs seek an award of compensatory and special damages, attorney's fees pursuant to 42 U.S.C. § 1988, costs, expert witness fees and legal interests from the date of the defense, actions and omissions.

## PRAYER FOR RELIEF

WHEREFORE, the plaintiff prays for relief against the Defendants:

1.  For an award of compensatory damages against South Jordan and Police Chief Lindsay Shepherd in an amount to be proved at the time of trial consistent with the evidence;

2.  For an award of compensatory and punitive damages against Nichols and Perez in an amount to be proved at the time of trial consistent with the evidence;

3.  For attorney's fees and costs pursuant to 42 U.S.C. § 1988;

4.  For interest, both pre-judgment and post-judgment, as allowed by law;

5.  Other such relief as the interests of justice require.

**PLAINTIFF DEMANDS TRIAL TO A JURY ON ALL ISSUES SO TRIABLE**

DATED this 6th day of October, 2011.

/s/ Elizabeth B. Grimshaw
Counsel for Plaintiffs
Aaron J. Prisbrey
Elizabeth B. Grimshaw
AARON J. PRISBREY, P.C.
1090 East Tabernacle Street
St. George, UT 84770
Telephone:  (435) 673-1661
taysha@prisbreylaw.com
elizgrimshaw@gmail.com

Plaintiff's Address:
Garry & Judy Pennington
PO Box 1083
Kamas, UT 84036-1083

Tyler Pennington
Box 122
4831 Lacey Ln., Apt. 306
Riverton, UT 84096-7248

## CERTIFICATE OF SERVICE

I certify that on this 6th day of October, 2011, I electronically filed the foregoing
SECOND AMENDED COMPLAINT (JURY DEMANDED) to the Clerk of the Court using the
CM/ECF system.


/s/ Elizabeth B. Grimshaw
Elizabeth B. Grimshaw